BURLINGTON, C. R. & N. RY. Co. *v.* NORTHWESTERN FUEL Co. and others.

*(Circuit Court, D. Minnesota. June Term, 1887.)*

1. RAILROAD COMPANIES—DISCRIMINATION IN RATES.

A contract by which a railroad company agrees to charge a rate of not less than $2.40 per ton to all persons shipping less than 100,000 tons of coal per annum over its road, and to make a rate of $1.60 per ton to all shippers shipping 100,000 tons or over, is void; the discrimination being so gross as to be contrary to public policy.

2. SAME—DIVISIBILITY OF CONTRACT.

Where a railroad company enters into a contract with a coal company for the carriage of the latter's coal, one clause of which is void as making an illegal discrimination against smaller shippers, and the obvious intent of the contract, read as a whole, is to secure to the coal company an illegal monopoly of the coal industry served by the railroad, the contract will not be disintegrated by the court for the purpose of enforcing against the railroad company other stipulations contained in it, which, though innocent on their face, were entered into with the intent of securing an illegal monopoly to the coal company, and would, if enforced, effect that purpose.

This is an action on an attachment bond executed in a former suit brought by the defendant herein against the plaintiff in this action, in which suit a large number of locomotives and cars belonging to this plaintiff were attached. The defendant fuel company, in its answer, sets forth the contract between itself and the plaintiff, and claims damages for an alleged total breach thereof by the plaintiff. Said contract is as follows:

"Memorandum of agreement made this seventh day of July, A. D. 1881, between the Burlington, Cedar Rapids & Northern Railway Company, a corporation created and existing under and by virtue of the laws of the state of Iowa, with head-quarters at Cedar Rapids, Iowa, hereafter called the party of the first part; and the Northwestern Fuel Company, a corporation created and existing by virtue of the laws of the state of Minnesota, with head-quarters at St. Paul, Minnesota, hereafter called the party of the second part,— witnesseth: In consideration of the premises and agreements hereinafter stated upon the part of the party of the second part, said first party agrees that they will establish and maintain, during the continuance of this contract, a rate on coal mined at or in the vicinity of What Cheer, Iowa, to Waseca, Chaska, Merriam Junction, Minneapolis, and White Bear, as follows: Two dollars and forty cents ($2.40) per ton on shipments of less than one hundred thousand (100,000) tons, annually, by any one party, Any one party shipping, or causing to be shipped, one hundred thousand (100,000) tons or more per annum, the rate to be *one dollar and sixty-five cents* ($1.65) per ton on all shipments from *October first* to *March thirty-first* of each year, and *one dollar and sixty cents* ($1.60) per ton on all shipments from *April first to September thirtieth* of each year.

"The second party agrees to ship, or cause to be shipped, during each year of this agreement, not less *than one hundred thousand* (100,000) tons of coal, and, in consideration of said agreement on the part of the said party of the second part, said party of the first part agrees to bill all coal consigned to said second party to points named at rates previously specified for shippers of *one hundred thousand* (100,000) tons or more per annum; both parties to this agreement to furnish all possible transportation,—party of the first part expecting and aiming to furnish an equal or excess number of cars as party of the second part. For such cars as the party of the second part may have constructed and placed in the trade they shall be allowed one-half cent ($\frac{1}{2}$ c.) per mile; in the event of the regularly established mileage or car service being made less than one-half cent ($\frac{1}{2}$ c.) per mile, such agreed mileage to apply to the cars furnished by said second party. Such cars as are furnished by parties of the second part shall be handled expeditiously, and hauled empty from Albert Lea southward to destination, and shall not be loaded except with the consent of the party of the second part. Said second party agrees to cause to be constructed and put into the trade at the earliest possible date, not less than two hundred (200) twenty- (20-) ton cars of the best construction, and increase that number to four hundred (400) as soon as the circumstances will warrant. The party of the second part will use all reasonable efforts to hurry the unloading and return of such cars as are furnished by the party of the first part.

"And it is further mutually agreed between the parties hereto that the party of the second part will ship by the lines of the party of the first part all coal mined, purchased, or controlled by them, or in which they may have any interest, which is produced from the mines at or in the vicinity of What Cheer that can be reached by the lines of the party of the first part and its connections; said party agreeing that it will at all times make such freight rates as

will enable second party to successfully compete for the business with any lines that may hereafter be built into above-mentioned district, with a view of taking coal to points that are reached by the lines of the party of the first part.

"This contract to take effect on and after this date, and continue in full force and effect for five (5) years from this date, unless changed by mutual consent and agreement, in which event six (6) months' notice to be given by one party to the other of any desired change.

"In witness whereof the parties to this agreement have hereunto set their hands and seals the day and year first before written; the party of the first part, by its general freight agent, at that time authorized, and the party of the second part, by its president, and corporate seal of the company.

"BURLINGTON, CEDAR RAPIDS & NORTHERN RY. Co.
"By A. L. MOHLER, General Freight Agent.
"Witness: J. STANFIELD.
"NORTHWESTERN FUEL COMPANY,
"By E. N. SAUNDERS, President.
[Seal of N. W. Fuel Company.] "Attest: H. Y. SMITH, Secy.
"Witness: J. STANFIELD.
"Approved: C. J. IVES, Genl. Supt. B., C. R. & N. R. R."

On the trial it appeared that the former action, which was brought in the district court for Ramsey county, and removed into this court, was tried at the June, 1883, term, and that at the close of the plaintiff's evidence the plaintiff asked and obtained leave to enter a nonsuit, with leave to move to reinstate the case, and thereupon a juror was withdrawn, and at the same time the court ordered a dissolution of the attachment. A motion to set aside said nonsuit was made and denied; but no further proceedings were had, and no further judgment was entered in the original action. The condition of that attachment was as follows:

"Now, therefore, if the said defendant recover judgment, the plaintiff shall pay all costs that may be awarded to the defendant, and all damages which he may sustain, by reason of the attachment, not exceeding the penalty of this bond, then this obligation to be void; otherwise, of force."

—And on the trial of this cause defendants insisted and requested an instruction that, in the absence of a formal entry of judgment in the former suit, no recovery could be had upon the attachment bond. Defendants also requested an instruction that no recovery could be had upon the bond unless a judgment upon its merits had been entered in the former action. Both these instructions were refused; the court holding that the nonsuit at the trial of the former action sustained the condition of the bond.

In support of the counter-claim pleaded in the answer the defendant introduced evidence tending to prove performance of the contract on its part, and a breach of the same on the part of the defendant plaintiff, and thereupon offered to show by competent evidence the amount of damages by the fuel company sustained by reason of such breach. The plaintiff objected to the admission of any evidence of damages, upon the ground, among others, that the contract was illegal, as being against public policy. The court ruled that, if the contract was legal, the defendants had introduced evidence sufficient of performance on its part,

and of a breach of the same by the plaintiff, to entitle them to introduce the evidence of damages offered; and upon the question of the validity of the contract pronounced the following opinion.

J. D. *Springer* and *C. K. Davis*, for Burlington Railroad Co., plaintiff.

*C. D. O'Brien, Geo. B. Young*, and *Gordon E. Cole*, for defendants.

BREWER, J. In this case, upon the questions which have been argued, I have come to a conclusion, and it is unnecessary to continue the argument further. I stop to consider but one question. I may premise by saying that a contract which puzzled my Brother MILLER, one whose pre-eminent abilities we all recognize, may well have puzzled me; and, while upon part of the question which I shall consider I am clear in my views, upon another part I am very much in doubt. That question is as to the validity of the contract as a whole. Its validity is questioned on the ground of discrimination, and that the one clause which provides for a discrimination is invalid I have little doubt. It provides that the company shall maintain a rate of $2.40 per ton on all coal shipped when the amount is less than 100,000 tons; and that the rate for 100,000 tons or more shall be $1.60 in summer, and $1.65 in winter. That such a discrimination is against public policy, and not to be sustained, I am very clear. On the face of it, it is a discrimination, based not upon the cost of transportation, upon the time and labor and annoyances which may result to the railroad company, but solely upon the amount of the transportation.

In the case of *Scofield* v. *Railway Co.*, 43 Ohio St. 606, 3 N. E. Rep. 907, are two quotations; one from Justice MILLER and one from Judge BAXTER. The one briefly quoted from Justice MILLER is:

"I am of the opinion that it is the duty of every railroad company to provide such conveyances, by special cars or otherwise, * * * as are required for the safe and proper transportation of this express matter on their roads, and that the use of these facilities should be extended on *equal terms* to all who are actually and usually engaged in the express business."

That, as a statement of the general law obligatory upon railroad companies, will not be questioned. The other quotation from Judge BAXTER comes more nearly to the case at bar. In it he says:

"The discrimination complained of rested exclusively on the *amount of freight supplied by the respective shippers during the year.* Ought a discrimination resting exclusively on such a basis to be sustained? If so, then the business of the country is in some degree subject to the will of railroad officials; for if one man engaged in mining coal, and dependent on the same railroad for transportation to the same market, can obtain transportation thereof at from twenty-five to fifty cents per ton less than another competing with him in business, solely on the ground that he is able to furnish, and does furnish, a larger quantity for shipment, the small operator will, sooner or later, be forced to abandon the unequal contest, and surrender to his more opulent rival. If the principle is sound in its application to rival parties engaged in mining coal, it is equally applicable to merchants, manufacturers, millers, dealers in lumber and grain, and to everybody else interested in any business requiring any considerable amount of transportation by rail; and it follows that the success of all such enterprises would depend as much on the favor of railroad officials as upon the energies and capacities of the parties

prosecuting the same. It is not difficult, with such a ruling, to forecast the consequences. The men who control railroads would be quick to appreciate the power with which such a holding would invest them, and, it may be, not slow to make the most of their opportunities and, perhaps, tempted to favor their friends to the detriment of their personal or political opponents; or demand a division of the profits realized from such collateral pursuits as could be favored or depressed by discriminations for or against them; or else, seeing the augmented power of capital, organize into overshadowing combinations, and extinguish all petty competition, monopolize business, and dictate the price of coal and every other commodity to consumers. We say, these results might follow the exercise of such a right as is claimed for railroads in this case. But we think no such power exists in them. They have been authorized for the common benefit of every one, and cannot be lawfully manipulated for the advantage of any class at the expense of any other. Capital needs no such extraneous aid. It possesses inherent advantages which cannot be taken from it. But it has no just claim, by reason of its accumulated strength, to demand the use of the public highways of the country, constructed for the common benefit of all, on more favorable terms than are accorded to the humblest of the land; and a discrimination in favor of parties furnishing the largest quantity of freight, and solely on that ground, is a discrimination in favor of capital, and is contrary to a sound public policy, violative of that equality of right guarantied to every citizen, and a wrong to the disfavored party, for which the courts are competent to give redress."

If it be true, as held by Judge WALLACE, that the rule forbidding an unjust discrimination does not necessarily prevent a railroad company from charging a less rate to one who ships a large quantity than to one who ships a small quantity, (and I am not prepared to deny that, under some circumstances, there is force in that proposition, on the same principle that a wholesale dealer sells a large bill of goods at a less rate than a small bill of goods,) yet, even with that limitation, a discrimination so vast as this is, and so purely arbitrary, and which is so obviously solely in the interest of capital, and not based upon reasonable distinction in favor of a large as against a small shipper, cannot be sustained. For here the contract provides a special rate for shipment of 100,000 tons or over; that is, for one who ships 99,500 tons it makes a rate of $2.40; while to the man who ships 100,000 tons, or 500 tons more than the other, it makes a rate of $1.60,—a difference of 50 per cent. in favor of the latter. Such a discrimination, even if any discrimination based upon the amounts of shipments is tolerable, is one so gross that it cannot be sustained. Upon that proposition I have no doubt, and I had none when the contract was first read; but the question which is doubtful is the one which I suggested to Gov. Davis, and which Judge YOUNG has commented upon at some length and with great ability. Conceding, and I think that Judge YOUNG practically concedes, that this stipulation, standing by itself, cannot be upheld,—conceding, I say, that this is invalid,—let it be dropped from the contract as surplusage, and there is a contract with ample considerations on both sides, for the shipment by the fuel company of 100,000 tons and over, and for the transportation by the railroad company at a specified rate, which contract the railroad company has broken; and can it *be allowed* to shield itself for its breach of that stipulation on the ground that there is some

other covenant in the contract which is void?    That is a very doubtful question.

If I hold against the defendant on this question, it is upon these grounds; in the first place, I may say that the fuel company is in no attitute to ask the straining of any point in order to uphold this contract in its behalf.    It has placed itself in the position of seeking to obtain from the railroad company, not merely very favorable rates, but a discrimination against other parties.    The contract, its evident purpose, and its necessary result, will be the building up in its own behalf of a monopoly of the coal business; and a party who voluntarily enters into a contract with such a purpose and necessary result is in no position to come before the courts and ask that anything shall be strained in its behalf, no matter what the conduct of the opposing party may be.    It needs but little reflection to see that such a contract as this, in its necessary result, would tend to build up a monopoly on behalf of the fuel company, and that that was its purpose was evident.    If it could succeed in making similar transportation contracts with other transportation companies, running to other coal-fields, it would soon be in a position where it would be absolute master of the coal business of this northwestern country.    It would have the monopoly of that business, and, when once that monopoly was secured, it could dictate prices to the consumers, and could dictate starvation wages to the producers in the coalfields; and finally, when the first contracts had expired, it could dictate transportation rates to the railroad companies.    And having thus, by these various contracts, reached out to the various coal-fields, and become master of the business, it would build up just such a monopoly, and by just such contracts, as the Standard Oil Company has built up in this country, to the great detriment of all.

It is true that where there are void and valid independent stipulations in a contract, a court will sometimes enforce the one, and ignore the other.    This was held in the case of *Erie Ry. Co.* v. *Union Locomotive & Exp. Co.*, 35 N. J. Law, 246; yet in the opinion the court says:

"These and other authorities which might be referred to, settle the rule that the fact that one promise is illegal will not render another disconnected promise void.    The doctrine will not embrace cases where the objectionable stipulation is for the performance of an immoral or criminal act, for such an ingredient will taint the entire contract, and render it uninforceable in all its parts by reason of the maxim, *ex turpi causa non oritur actio;* nor will it, in general, apply where any part of the consideration is illegal.    So that, in the present case, if upon the trial it should appear that the plaintiffs had agreed to pay to the defendant more than the charter of the latter allows, it may become a question whether this suit will lie.    There are many decisions to the effect that where there are a number of considerations, and any one of them is illegal, the whole agreement is avoided; this doctrine being put upon the ground of the impossibility of saying how much or how little weight the void portion may have had as an inducement to the contract."

Judge YOUNG, in his argument, very forcibly puts the question in this way:    That one promise of the railroad company was to transport for $1.60 per ton, and that that was a promise independent of the one that

it would not ship for any one a less amount than 100,000 tons at a less rate than $2.40. On the other hand, the promise of the fuel company was that it would ship 100,000 tons or over, and that it would furnish 400 cars for the transaction of this business, and that the entire promise of the fuel company was legitimate. The promise to ship, and the promise to furnish these cars,—the consideration furnished by the fuel company,—therefore, being entirely unobjectionable, we can look upon these two promises of the railroad company as separate and independent, and uphold the one while we reject the other. As I said before, there is great force in that; but the contract must be looked upon as an entirety, and it must be looked upon under the circumstances that surrounded the parties at the time,—not merely for the purpose of determining the consideration of the various stipulations, but also for the purpose of determining the intent of the parties.

What were those circumstances? There were undeveloped, or partially developed, coal-fields at What Cheer; the railroad company with a limited business; and the fuel company seeking to occupy this territory for the business of supplying coal. The railroad company sought to increase its transportation business, and the fuel company to monopolize the business of supplying the market here. The latter had not merely the desire to obtain rates for itself, which it could have accomplished by the one stipulation of a rate of $1.60 a ton, but it had the further purpose of excluding competition, securing it by enforcing or obtaining from the railroad company a promise that no other limited shipper should have anything like equal terms. As stated, the cost of production at the mines was no greater than the rate of transportation awarded to this fuel company If, in addition to that, it could secure from the railroad company a guaranty that only those who should embark enormous capital in the business could obtain anything like favorable terms of transportation, it would be in a position to monopolize the supply of coal from that territory for this market; and that such was its intent is obvious, not merely from the stipulation as to rates, but also from other provisions of the contract. The railroad company was one of limited means, and unable, as it seems, to furnish the cars necessary for such an immense transportation. The evidence shows that it would need trains of 14 cars a day to ship this 100,000 tons. The fuel company agreed to furnish 400 cars. This stipulation for additional cars, and other stipulations, impose such promptness and such transportation engagements on the part of the railroad company, for the benefit of this fuel company, as practically to prevent it from entering into the business of shipping coal for any other party.

No person can read that contract in the light of the circumstances without perceiving that there was on the part of the fuel company an attempt to monopolize the entire product of this coal-field, as far as respects this market; and it would be part and parcel of similar purposes to control in like manner the products of other coal-fields. To sustain the contract even in part would practically validate it for all purposes, and lend the aid of the court to the furtherance of such an objectionable scheme.

It is impossible, in my opinion, to disintegrate this contract, and to say that one part is good, and the other bad. It cannot be said, by the reading of the contract under the circumstances, that the parties would have entered into it with simply the unobjectionable features in it. They entered into that contract as a whole, binding upon both parties. It would be wrong now to attempt its disintegration, or try to throw out one part, and leave the other in force. As I said before, this is a doubtful question, and I am not as clear upon this point as upon the other. At the same time it seems to me that courts, when they have such a contract as that before them, should not try to divide it,—should not try to uphold any distinct parts. The authorities cited show such to be the rule in a case like this, and indicate that if one part of such a contract is void, and the other part valid, the contract must be read as an entirety, and a whole declared void. Any other doctrine would result in building up monopolies.

I do not mean to intimate that I consider that the conduct of the railroad company is free from blame in this matter. It obviously went into this contract deliberately, for its own gain, and from pecuniary motives; and, when it found that it did not pay to carry out the contract, it as deliberately made efforts to break it. But courts, when such matters come before them, should not and do not act from any considerations of approval or disapproval of the conduct of parties. But when the evidence shows, as in this case, that a contract is one that is against public policy, and tends to the building up of monopolies which are against the spirit of our institutions, courts do not lend their aid,—certainly do not strain anything to sustain such a contract. But they say that persons that enter into such contracts need never expect, no matter what may be the wrongful conduct of the other party, any recognition in courts of justice; so, while it is very evident that this railroad company, having entered into this contract deliberately, set about as deliberately to break it, yet, at the same time, the parties in the first instance, in making the contract, were equally blamable,—the one seeking to build up a monopoly, and the other willing to assist in such purpose. Parties who enter into these contracts must depend upon the good nature and *bona fides* of each other, and not upon the aid of the court, to see that these contracts are carried out.

The objection to the introduction of the testimony as to damages will be sustained.

The jury found a verdict in favor of the plaintiff for $6,520.06.